IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Marvin H. McGhee, ) | Civil Action No. 6:14-2644-JMC-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on March 10, 2009, alleging that he became unable to work on December 6, 2008. The application was denied initially and on reconsideration by the Social Security Administration. On August 25, 2010, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Mary L. Cornelius, an impartial vocational expert, appeared on September 19, 2011, considered the case *de novo* and, on November 4, 2011, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended (Tr. 98-106). On February 11, 2013, the Appeals Council granted the plaintiff request for

review and remanded the matter to the ALJ for further administrative proceedings. In the remand order, the Appeals Council directed further consideration of the July 2009 opinion of treating physician William Warmath, M.D., and the disability rating given to the plaintiff by the Department of Veterans Affairs ("VA") (Tr. 113-14).

On August 7, 2013, the same ALJ held a second hearing, where the plaintiff and William W. Stewart, Ph.D., an impartial vocational expert appeared. During this hearing, the plaintiff amended his disability onset date to August 24, 2011 (Tr. 83). On October 29, 2013, the ALJ issued a decision finding that the plaintiff was not under a disability (Tr. 11-24). The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on October 29, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

(2)    The claimant has not engaged in substantial gainful activity since August 24, 2011, the alleged onset date (20 C.F.R §§ 404.1571 *et seq*).

(3)    The claimant has the following severe impairments: degenerative disc disease of the lumbar spine with occasional radiculopathy; degenerative disc disease of the cervical spine, status post fusion surgery, chronic pain syndrome, depression, anxiety/post-traumatic stress disorder by history, and personality disorder (20 C.F.R. § 404.1520(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform  a range of sedentary work as defined in 20 C.F.R. § 404.1567(a)

in that he can lift and carry no more than ten pounds; and stand and/or walk for no more than two hours in a workday. He requires an option to alternate sitting and standing at the workstation at his discretion, within those parameters. He can do more than occasional reaching overhead and no operation of foot pedals or other controls with either lower extremity. He can occasionally stoop, twist, crouch, kneel, balance, and climb stairs and ramps but never crawl or climb ladders and scaffolds. He must avoid hazards such as unprotected heights, vibration, and machinery with exposed, hazardous moving parts and requires a level work surface/floor. Due to his mental impairments, he is further restricted to simple, routine tasks in a supervised environment and requiring no required interaction with the public or team-type interaction with co-workers.

(6)    The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)    The claimant was born on May 28, 1968, and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date, as amended. The claimant subsequently changed age category to a younger individual age 45-49 (20 C.F.R. § 404.1563).

(8)    The claimant has more than a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569 and 404.1569(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from December 6, 2008, through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He

4

must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 43 years old on his amended alleged onset date and was 45 years old at the time of the ALJ's decision.  He graduated from high school, attended college for two years, and has past work experience as a mail handler and mailroom supervisor (Tr. 64, 66-67).

The record indicates that the plaintiff received mental health treatment for a mood disorder and personality disorder periodically since approximately 2006 (Tr. 375-402, 407-14).  The plaintiff refused the recommended antidepressant medication and mental health therapy (Tr. 376-78, 389, 400, 412).  The plaintiff was medically retired from his job on July 22, 2009 (Tr. 262).  In a letter dated March 12, 2009, the plaintiff's VA Disability Rating was increased to render him unemployable effective December 7, 2008, due to a combination of his physical and mental impairments (Tr. 304).

In December 2008, the plaintiff underwent C3-4 cervical disc arthroplasty (Tr. 755-56).  He developed a post-operative infection for which he underwent removal of the infected prosthesis, cervical decompression and fusion of C2 to C5, antibiotic regimen, and placement of a halo brace in February 2009 (Tr. 753-54).  Two weeks later, the plaintiff was ambulating well, clinically stable, and transferred to Health South rehabilitation program (*id*.).  Having made good progress, the plaintiff was discharged from rehabilitation in the beginning of March 2009 (Tr. 688).  Upon discharge, the plaintiff was in no acute distress, and he had full to near full (four plus to five out of five) muscle strength, intact muscle tone, no edema, and intact reflexes in his extremities.  The plaintiff was referred for physical and occupational therapy and continued on antibiotics (*id*.).  At the end of March 2009, neurosurgeon William Warmath, M.D., found that the plaintiff was "doing well," and his cervical spine x-rays looked "quite good"; therefore, he was advised the plaintiff to discontinue use of the halo brace (Tr. 813).  In April 2009, Harpreet Singh, M.D., found the

6

plaintiff's physical examination findings were within normal limits, including no edema, cyanosis, and full range of motion ("ROM") in his extremities (Tr. 1236-37).

Approximately three months post-operatively, in May 2009, the plaintiff followed-up with Dr. Warmath, who noted that the plaintiff's cervical spine x-rays looked "very good."  The plaintiff reported "some neck aches but really without sig[nifcant] neck pain."  Dr. Warmath recommended mobility exercises (Tr. 1577).

In June 2009, Rebecca Meriwether, M.D., a state agency physician, reviewed the evidence of record and concluded that the plaintiff would be capable of performing light work (Tr. 1414-21).  More specifically, the plaintiff could lift twenty pounds occasionally and ten pounds frequently; could stand/walk for six hours in an eight hour workday; could sit for six hours in an eight hour workday; had limited ability to reach overhead; and could occasionally climb ramps/stairs, stoop, knee, crouch, and crawl (Tr. 1414-21).

In July 2009, Dr. Warmath indicated that the plaintiff had "excellent" results from his cervical spine fusion, demonstrated by radiographs (Tr. 1540).  He recommended exercise and strengthening activities to regain full mobility and reduce pain.  At the same time, Dr. Warmath noted in the record that the plaintiff was "totally and permanently disabled" (*id.*).  The following month, Clayton Ramsue, M.D., recorded that the plaintiff had full motor strength; intact sensation, reflexes, and pulses; and no edema in his upper and lower extremities (Tr. 1535).

In May 2010, Philip Michels, Ph.D., a state agency psychologist, reviewed the mental health evidence of record and concluded that the plaintiff was capable of carrying out short, simple instructions; had the ability to sustain an ordinary routine without special supervision; responded appropriately to changes in work setting; and could engage in simple work that involved minimal involvement with the general public (Tr. 1897, 1901).

In June 2010, Vasant Garde, M.D., performed a consultative examination at the request of the state agency (Tr. 1903-07).  Upon examination, the plaintiff did not

7

appear to be in any acute distress (Tr. 1905). The plaintiff initially appeared in the medical office without any assistive device, but later went back to his car and returned with a walker. Dr. Garde found that the plaintiff's gait and pace appeared normal (Tr. 1905). The plaintiff had "mild" limitation of flexion, extension, and rotation of his cervical spine; normal ROM in his lumbar spine; normal ROM in his upper extremities (with the exception of reduced abduction with his left arm); and normal ROM in his lower extremities (Tr. 1906). Although the plaintiff "constantly complained of pain here and there," he had no atrophy, swelling, abnormal movements, or tremors; full motor strength; and intact sensory and motor functioning (Tr. 1906). The plaintiff also had full ROM in his hands and full grip strength (Tr. 1906).

In July 2010, Elva Stinson, M.D., a state agency physician, reviewed the updated record and found that the plaintiff was capable of performing medium work that involved lifting no more than twenty-five pounds frequently and fifty pounds occasionally; standing/walking for six hours in an eight hour workday; sitting for six hours in an eight hour workday; frequent overhead lifting; and occasional climbing ramps/stairs, stooping, kneeling, crouching, and crawling (Tr. 1909-14).

In November 2010, an MRI of the plaintiff's cervical spine revealed status post anterior spinal fusion C3-5 with moderate facet hypertrophy, a mild disc bulge at C6-7 compressing the right intervertebral nerve, and a mild bulge at C7-1 with very mild compression on the left intervertebral nerve secondary to facet hypertrophy (Tr. 1941).

In February 2011, the plaintiff appeared for mental health treatment with Henry Othersen, M.D., at the VA Medical Center (Tr. 1917). The plaintiff reported depression secondary to pain. The plaintiff said he was "stuck at home" due to the cold weather and spent time reading and watching television shows with "substance" (*id*.). He reported that he had arrived late for the appointment because he was giving someone a ride (Tr. 1918). Dr. Othersen found that the plaintiff interacted cooperatively, appeared

8

well-groomed, spoke normally, exhibited a depressed mood, and displayed coherent and linear thought processes (*id.*). Dr. Othersen diagnosed mood disorder associated with chronic pain, depression, and anxiety disorder rule out PTSD and assessed the plaintiff with a Global Assessment of Functioning ("GAF") score of 51[1] (Tr. 1919). Dr. Othersen noted that the plaintiff had a history of frequent missed appointments and poor compliance with his psychotropic medication. Although the plaintiff had been better at attending appointments, he was still not compliant with his medication regimen (Tr. 1918). Dr. Othersen re-started the plaintiff on medication (Tr. 1919).

In March 2011, the plaintiff was referred to Donald Johnson, M.D., of the Southeastern Spine Institute, to whom the plaintiff reported that he wanted to focus on his back pain (Tr. 1976-78). Dr. Johnson found that the plaintiff appeared to be in no acute distress; he was able to ambulate without an assistive device, although the plaintiff indicated that he used a cane for extra support; his gait and station were normal; he was able to mount/dismount the examination table and rise from a chair; he had normal musculature, no evidence of spasm, bony abnormalities, or tenderness in his spine; he had no edema, good ROM, full muscle strength, and intact sensation and reflexes of his lower extremities; he had full ROM of his cervical spine, although he moved slowly with extension and flexion; he had full ROM, full muscle strength, and intact sensation and reflexes in his upper extremities; and he had full grip strength (Tr. 1977). Dr. Johnson diagnosed lumbar facet arthritis and suggested radiofrequency ablation treatment, which the record indicates the plaintiff never received (Tr. 1978).

---

[1]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

In a May 2011 appointment with the VA Medical Center, the plaintiff was calm and cooperative; exhibited a euthymic mood and full range of affect; displayed intact concentration and memory; and had linear, goal-directed thought processes (Tr. 1982).

On August 2, 2011, the plaintiff and his girlfriend saw Dr. Othersen, reporting relationship problems and increased irritability (Tr. 2013). Dr. Othersen found that the plaintiff interacted cooperatively, made little eye contact, displayed a depressed mood, and had coherent and linear thought processes (Tr. 2014). Dr. Othersen noted the plaintiff's poor medication compliance (Tr. 2013). Dr. Othersen adjusted the plaintiff's psychotropic medication, which he thought may be contributing to the plaintiff's increased irritability (Tr. 2014). The day after the appointment, the plaintiff called Dr. Othersen's office requesting that the physician write him a letter concerning his limited ability to work secondary to his irritability (Tr. 2017). At the plaintiff's request, Dr. Othersen gave him a letter "to whom it may concern," indicating that the plaintiff had significant "irritability concerns that greatly limit his current ability to deal with public" and that his medications were being adjusted to treat these symptoms (Tr. 2018). Dr. Othersen noted that the plaintiff was presently incapable of gainful employment due to his mental health concerns (*id*.).

On August 24, 2011, the plaintiff reported to Casey Dellabarca, M.D., that he was having intermittent aching in his neck, which at its worst was a six on a scale of one to ten (Tr. 2003). The plaintiff also reported pain radiating into his arms and weakness in his hands of approximately a two weeks duration (*id*.). Dr. Dellabarca found that the plaintiff appeared to be in no acute distress and ambulated without difficulty or the assistance of a hand-held device (Tr. 2006). The plaintiff had normal muscle strength in his upper extremities, diminished sensation in his upper left extremity, and negative Spurling's and Tinel's signs (Tr. 2007). Dr. Dellabarca diagnosed the plaintiff with subjective weakness in his hands with no increase in cervicalgia (*id*.). An EMG and nerve conduction study indicated mild bilateral carpal tunnel syndrome and mild ulnar neuropathies, localized to the

10

elbows (Tr. 2193-94). The plaintiff was prescribed wrist splints and instructed to perform home exercises (Tr. 2152).

On August 29, 2011, the plaintiff saw Gary Bell, M.D., to get disability paperwork completed (Tr. 2040). The plaintiff indicated that he was not planning on undergoing radio frequency ablation and that recent weight loss helped to decrease his back pain (*id*.). Dr. Bell completed a questionnaire entitled "Medical Opinion Re: Ability to Do Work-Related Activities" (Tr. 2045-48). Dr. Bell checked boxes indicating that the plaintiff could lift less than ten pounds; could sit for three hours in an eight-hour workday; could stand for less than two hours in an eight-hour workday; needed a sit-stand option; could occasionally stoop, couch, and twist; had limitation in his ability to reach, but no limitation in his ability to handle and finger objects; and should avoided exposure to hazards and concentrated exposure to temperature extremes (Tr. 2045-48).

A cervical x-ray dated February 1, 2012, showed status post fusion with inter-body grafts and a small spur at left C3-4 neural foramen (Tr. 2054-55).

In February 2012, the plaintiff returned to Dr. Othersen stating that he had just returned from an extended trip visiting his family in Connecticut and had "enjoyed [his] time there" (Tr. 2168). The plaintiff reported improvement in his irritability (*id*.). Dr. Othersen documented that the plaintiff interacted cooperatively, made little eye contact, displayed an "okay" mood and congruent affect, and exhibited coherent and linear thought processes (Tr. 2169).

In March 2012, the plaintiff reported diffuse pain all over his body (Tr. 2156, 2219). Dr. Bell ordered an MRI of the plaintiff's lumbar spine, which showed disc protrusion at L3-4 and L4-5 and an annular tear at L-5/S-1, without significant central canal stenosis (Tr. 2229). The plaintiff received a course of physical therapy for his degenerative disc disease from April to July 2012 (Tr. 2113-14, 2146-48). The plaintiff reported benefit from the use of a transcutaneous electrical nerve stimulations ("TENS") unit (Tr. 2113).

11

In May 2012, the plaintiff presented to the Providence Hospital emergency room, reporting neck and back pain following a motor vehicle accident he was involved in the previous day (Tr. 2242-45). Upon examination, the plaintiff had paraspinal tenderness, but no motor or sensory deficits, and diagnostic studies showed no acute findings (Tr. 2244). The plaintiff was prescribed pain medication and discharged in an improved condition (Tr. 2245). Two weeks later, the plaintiff followed-up with Dr. Bell, who gave him an injection of Tramadol and adjusted his pain medication (Tr. 2214-15).

In July 2012, the plaintiff initiated care with Devin Troyer, M.D., a physical medicine and rehabilitation specialist, reporting increased neck and back pain since his car accident (Tr. 2201-02). The plaintiff reported that since the accident, he had traveled to Connecticut for his daughter's graduation and stayed to spend time with family for approximately a month (Tr. 2201). The plaintiff had diminished ROM in his spine (*id*.). Dr. Troyer diagnosed exacerbation of chronic cervical and lumbar spine pain, prescribed pain medication, and recommended physical therapy, home exercise, and stretching (Tr. 2202). By the end of July, Dr. Troyer documented that the plaintiff was "doing reasonably well," and his ROM was improving with therapy, home exercise, and stretching (Tr. 2200).

In August 2012, the plaintiff reported pain in his left shoulder, in addition to his neck and back pain, to Dr. Troyer (Tr. 2199). An ultrasound showed arthritic changes in the left acromioclavicular joint and a partial tear of the supraspinatus tendon (Tr. 2197-98). Physical therapy was recommended as well as steroid injection (Tr. 2198). By the end of August, Dr. Troyer found that the plaintiff had good cervical ROM without pain or discomfort; he had "good" ROM in his shoulders with slightly diminished active ROM with flexion and abduction on the left (to 100 degrees); good ROM in his elbows, wrists, and fingers; and full muscle strength in his upper extremities with the exception of a "little bit" of weakness of the thumb abductor on the left (consistent with mild carpal tunnel syndrome) (Tr. 2196).

12

In November 2012, the plaintiff was "doing well." The plaintiff reported significant relief following an injection to his left shoulder, and that he had "no pain or discomfort." Upon examination, Dr. Troyer found that the plaintiff had good ROM in his cervical spine, shoulders, elbows, wrists, and fingers; full to near full (four plus to five out of five) motor strength in his extremities; he was able to ambulate with a slow, symmetrical gait without assistive device; he had good ROM in his lower extremities; and his straight leg raising tests were negative. Dr. Troyer diagnosed improved left shoulder pain and improved cervical and lumbar spine strain. Dr. Troyer recommended that the plaintiff continue his home stretching exercises. Because of his progress, Dr. Troyer and the plaintiff agreed that the plaintiff did not need any further treatment, and Dr. Troyer released the plaintiff from his care (Tr. 2195).

On November 6, 2012, at a routine physical, Dr. Bell noted that the plaintiff exhibited normal motor strength, no focal deficits, no edema, and intact pulses and deep tendon reflexes in his extremities. The plaintiff was alert and oriented, interacted cooperatively, displayed appropriate mood and affect, and exhibited normal judgment (Tr. 2210).

On November 13, 2012, Dr. Othersen discussed the plaintiff's poor medication compliance with him because he had not been refilling his medication. Because the plaintiff indicated that the medication was too sedating, Dr. Othersen decreased the dosage and encouraged daily compliance on the lower dose (Tr. 2091-92).

In February 2013, despite the medication adjustment, the plaintiff still refused to take psychotropic medication reporting that he slept "too much" while taking it (Tr. 2085). Dr. Othersen found that the plaintiff was cooperative, displayed an "okay" mood and congruent affect, and had coherent and linear thought processes (Tr. 2086). Dr. Othersen changed the plaintiff's psychotropic medications based on his report of over-sedation and

non-compliance, noting that the plaintiff had not refilled his psychotropic medication since November 2012 (Tr. 2086-87).

On May 2, 2013, at a visit to the VA Medical Center, the plaintiff reported depression of a four on a scale of one to ten and that he had been getting out socially, attending church, and walking (Tr. 2075). The plaintiff was cooperative, exhibited no abnormal behaviors, and spoke normally (Tr. 2075-76). He reported a "fair" mood and exhibited a normal affect; had intact, goal-directed thought processes; denied any hallucinations or suicidal/homicidal ideation; and he was alert with fair concentration (Tr. 2076).

On May 22, 2013, the plaintiff reported to Dr. Bell that he had been "doing well with regard[] to his neck and back" pain (Tr. 2205). The plaintiff was alert and oriented, interacted cooperatively, displayed appropriate mood and affect, and exhibited normal judgment (Tr. 2206).

***Administrative Hearing Testimony***

At the initial hearing on September 19, 2011, the plaintiff testified that he had stiffness in his neck and numbness in his bilateral upper extremities, left greater than right. He testified that he had some improvement in his radicular symptoms following his fusion, but he continued to notice a decrease in strength with grasping (Tr. 39-40). The plaintiff also testified that he suffered from back pain that radiated into his bilateral lower extremities, left greater than right. He stated that he was unable to lift and carry more than ten pounds, sit for more than fifteen minutes without changing position, stand more than twenty minutes, or walk more than fifteen to twenty minutes before taking a break. He also testified that he was prescribed a cane through the VA Medical Center, but preferred to use a walking stick made for him by a former Marine (Tr. 43, 48). Additionally, the plaintiff testified that he suffers from significant anxiety, anger, frustration, irritability, inability to sleep, and nightmares as a result of his mental conditions (Tr. 52).

14

During the remand hearing on August 7, 2013, the plaintiff testified that his upper extremity symptoms had worsened to the point where he was having increased difficulty grasping things and experiencing pain in his hands and arms (Tr. 69-73). The amended onset date was suggested because it referenced consistent complaints of bilateral weakness and paresthesia in the plaintiff's bilateral hands (Tr. 70-71; *see* Tr. 2003-07 (August 24, 2011, report to pain management of two week history of paresthesia in his hands)).

The ALJ asked the vocational expert to consider an individual of the plaintiff's age, education, and work experience, who was able to perform a range of sedentary work that involved lifting/carrying no more than ten pounds; standing/walking for no more than two hours in an eight-hour workday; the option to alternate between sitting and standing at will; only occasional overhead reaching; no operation of foot pedals or other controls with either lower extremity; occasional stair/ramp climbing, stooping, twisting, crouching, kneeling, and balancing; no climbing ladders/scaffolds/ropes; no exposure to environmental hazards such as unprotected heights, vibration, or machinery with exposed, dangerous moving parts; a work environment that had a level floor/surface; only simple, routine tasks in a supervised environment; and no interaction with the public or team-type interaction with co-workers (Tr. 85-86). The vocational expert testified that this hypothetical individual could perform work as an assembler, an order clerk, and a bench hand table worker, including hand cleaner and hand packer (Tr. 87).

The plaintiff's attorney asked the vocational expert to add restrictions regarding handling and fingering to occasional use of bilateral upper extremities, and the vocational expert replied that the previously identified jobs would not be available, and he could identify no other unskilled jobs that would be available to such an individual (Tr. 88-89).

15

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) abusing his discretion in denying the plaintiff a full and fair administrative hearing; (2) failing to properly consider the opinions of the plaintiff's treating physicians; and (3) failing to find the plaintiff's testimony regarding his impairments credible.

### *Administrative Hearing*

In his first allegation of error, the plaintiff argues that the ALJ's decision denying his claim for benefits "was as a result of a blatant abuse of discretion" (pl. brief at 4). Specifically, the plaintiff alleges as follows:

> During the remand hearing on August 7, 2013, the ALJ initiated a discussion with the plaintiff's attorney regarding whether or not the plaintiff had considered amending his alleged onset date as he had additional diagnoses that affected his ability to engage in work related activity. The plaintiff's attorney informed the ALJ that she had and would be willing to further discuss such with the plaintiff (Tr. 67-68). After discussing the medical evidence with the ALJ, the plaintiff's attorney agreed that she would speak with the plaintiff about amending the onset date to August 24, 2011 (Tr. 70-71, 82-83). Based on prior dealings with the ALJ, he only suggests discussing amended onset dates if he intends to pay the claim from the amended date. The participants went off the record to allow the plaintiff and his attorney to discuss the amended onset date. The plaintiff was adamant that he should be awarded benefits from the original onset date; however, he reluctantly allowed his attorney to convince him that strategically amending the onset date would be the only way to obtain a favorable decision from the ALJ given his suggestion that they amend the date. When the hearing reconvened, the ALJ accepted a motion to amend the onset date and proceeded to propose a hypothetical to the vocational expert (Tr. 82-83). The hypothetical was interrupted by the ALJ addressing the plaintiff a second time regarding his walking stick/cane (Tr. 86). After a fairly heated exchange, the ALJ continued with his hypothetical; however, he left out any reference to the additionalimpairments discussed prior to the break in the proceedings. This resulted in the vocational expert being able to identify jobs at the unskilled, sedentary level (Tr. 87). When the plaintiff's counsel added the additional restrictions that the ALJ failed to include in his hypothetical, the vocational expert indicated that no jobs existed (Tr. 88).

16

(Pl. brief at 4-5). The plaintiff further argues that the ALJ in his written decision "failed to address the reduction of function in the plaintiff's hands due to paresthesia . . . ; however, he began including limitations based on the plaintiff's upper extremity symptoms prior to the final exchange between the ALJ and plaintiff" (*id.* at 6). The plaintiff contends that "the transcript reveals that there was an implicit promise of a fully favorable decision from an amended onset date" (*id.* (citing Tr. 70-71)).

The plaintiff requested review of the ALJ's decision by the Appeals Council. In its notice of action, the Appeals Council addressed the complaint of bias by the ALJ, stating, "After reviewing the entire record, including the hearing recording, the Appeals Council has determined that there was no abuse of discretion and that no other basis exists to grant review in this case" (Tr. 2).

A Social Security claimant is entitled to a hearing that is "full and fair." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir.1996). The ALJ plays a "crucial role in the disability review process" and has a duty to "develop a full and fair record" and to "carefully weigh the evidence, giving individualized consideration to each claim." *Id*. at 1401. An ALJ is presumed to be unbiased unless there is a showing of conflict of interest or some other specific reason for disqualification. *Schweiker v. McClure*, 456 U.S. 188, 195 (1982). *See Perkins v. Astrue*, 648 F.3d 892, 902 (8th Cir. 2011) ("'ALJs and other similar quasi-judicial administrative officers are presumed to be unbiased.'") (quoting *Rollins* v. *Massanari*, 261 F.3d 853, 857 (9th Cir. 2001)). "A claimant bears the burden of producing sufficient evidence to overcome this presumption." *Perkins*, 648 F.3d at 902-903 (citation omitted). "'[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women sometimes display' do not establish bias." *Id.* at 903 (quoting *Rollins*, 261 F.3d at 358).

As argued by the Commissioner, the plaintiff has failed to show that the ALJ made an "implicit promise of a fully favorable decision from an amended onset date" (pl.

brief at 4-6).  The plaintiff, under the advisement of his attorney, made a strategic decision to amend his alleged disability onset date in light of his subsequent impairments, which he asserted prevented him from performing even sedentary level work (Tr. 83). The ALJ did not improperly coerce or influence the plaintiff to amend his onset date (Tr. 67-68, 82-83). Rather, the ALJ afforded the plaintiff and his attorney ample opportunity to privately discuss the issue, and thereafter, the plaintiff made a request to amend his alleged onset date (Tr. 82-83). There is nothing in the hearing record to suggest that the ALJ implicitly promised a finding of disability if the plaintiff amended his onset date (Tr. 61-90).

Furthermore, the plaintiff asserts that the ALJ based the disability determination solely upon the plaintiff's demeanor once the hearing reconvened (pl. brief at 6-7).  However, the record shows that the ALJ based the plaintiff's residual functional capacity ("RFC") and ultimate disability determination on his thorough review of the relevant evidence, to which he cited in his well-reasoned decision (Tr. 11-24). Specifically, the ALJ considered the clinical and objective medical evidence – since December 2008 notwithstanding the plaintiff's amended onset date, the plaintiff's testimony and subjective complaints, the medical opinions, the plaintiff's treatment modalities and their effectiveness, and the plaintiff's activities (Tr. 15-21).

The plaintiff contends that, prior to the "ALJ addressing the plaintiff a second time regarding his walking stick/cane," the ALJ "began including limitations based on the plaintiff's upper extremity symptoms" (pl. brief at 5 (citing Tr. 86)).  However, after "a fairly heated exchange" with the plaintiff (*id.*), the ALJ left out any reference to the limitation of occasional handling and fingering in the bilateral upper extremities, which would eliminate the jobs identified by the vocational expert (*id.* at 4-5; *see* Tr. 85-88).  However, in his written decision, the ALJ found that the plaintiff's subjective complaints concerning his limited ability to use his hands were undermined by the objective medical evidence and other evidence of record (Tr. 16-20). For example, as noted by the ALJ, the plaintiff had full

to near full motor strength in his upper extremities and good grip strength (Tr. 17-19; *see* Tr. 1906, 1977, 2007, 2195-96). Furthermore, the ALJ observed that the plaintiff had no difficulty using his hands during the administrative hearing, demonstrating a good grip and manual dexterity (Tr. 20).

Based upon the foregoing, the plaintiff has failed to show bias by the ALJ that deprived him of a full and fair hearing. Accordingly, this allegation of error is without merit.

### Treating Physicians

The plaintiff next argues that the ALJ failed to properly consider the opinions of his treating neurosurgeon, Dr. Warmath, and his treating psychiatrist, Dr. Othersen (pl. brief at 7-10). The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b) and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

19

> [A] finding that a treating source medical opinion is not
> well-supported by medically acceptable clinical and laboratory
> diagnostic techniques or is inconsistent with the other
> substantial evidence in the case record means only that the
> opinion is not entitled to "controlling weight," not that the
> opinion should be rejected. Treating source medical opinions
> are still entitled to deference and must be weighed using all of
> the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In
> many cases, a treating source's medical opinion will be entitled
> to the greatest weight and should be adopted, even if it does
> not meet the test for controlling weight.

*Id.* at *4.

### 1. Dr. Warmath

On July 14, 2009, Dr. Warmath indicated that the plaintiff had "excellent" results from his cervical spine fusion, demonstrated by radiographs, with some limited neck mobility with muscular pains. He recommended exercise and strengthening activities to regain full mobility and reduce pain. At the same time, Dr. Warmath noted that the plaintiff "has chronic back pains; uses walker" and is "totally and permanently disabled because of his cervical and lumbar problems" (Tr. 1540).

The ALJ found that Dr. Warmath's opinion that the plaintiff was "totally and permanently disabled" was entitled to little weight because it was not well-supported by clinical evidence and was inconsistent with substantial evidence in the record (Tr. 20-21). As the ALJ discussed, Dr. Warmath did not offer an opinion as to the nature or severity of the plaintiff's impairment or his work-related limitations, but instead, offered a conclusory statement on an issue reserved to the Commissioner, and accordingly, it was not entitled to any special significance (Tr. 20). *See* 20 C.F.R. § 404.1527(d); *see also* SSR 96-5p, 1996 WL 374183, at *5.

Furthermore, the ALJ found that the supportability of Dr. Warmath's opinion and its consistency with the rest of the record weighed against affording it any significant weight (Tr. 20-21). The ALJ explained that Dr. Warmath did not identify any objective

clinical findings or diagnostic evidence to support his findings (Tr. 21). Moreover, Dr. Warmath's opinion was offered just a few months after the plaintiff's cervical spine fusion and nearly two years prior to the plaintiff's amended alleged onset date (Tr. 20). Further, the opinion was inconsistent with Dr. Warmath's treatment notes. For example, the ALJ noted that Dr. Warmath's opinion was offered "immediately after describing the excellent results of the fusion and only minor subjective complaints" (Tr. 20 (citing Tr. 1540)). The plaintiff reported "some neck aches but really without sig[nificant] neck pain," and Dr. Warmath recommended exercise and strengthening activities to increase mobility (Tr. 1540, 1577). Furthermore, the ALJ noted that Dr. Warmath indicated in his July 14, 2009, office notes that he would see the plaintiff again only after four months, and the evidence of record does not show that he saw the plaintiff even then (Tr. 20-21). Likewise, as noted by the Commissioner, Dr. Warmath's opinion was inconsistent with other evidence of record that showed improvement following surgery and no disabling functional limitations. Specifically, the plaintiff had full to near full ROM in his cervical spine and upper extremities and intact sensation, reflexes, and full motor strength in his upper extremities (Tr. 16-19; *see* Tr. 1906, 1977-78, 2007, 2195-96, 2210).

Based upon the foregoing, the undersigned finds that the ALJ's assessment of Dr. Warmath's opinion was without legal error and based upon substantial evidence.

### 2. *Dr. Othersen*

In a "to whom it may concern" letter dated August 12, 2011, Dr. Othersen stated that he had treated the plaintiff since September 2007 for "mood disorder - depressed secondary to chronic pain with concern for bipolar disorder not otherwise specified." He stated that the plaintiff had "significant irritability concerns that greatly limit his current ability to deal with public" and that his medications were being adjusted to treat these symptoms. Dr. Othersen stated that the plaintiff was "presently incapable of gainful employment due to his mental health concerns" (Tr. 2018).

21

The ALJ concluded that Dr. Othersen's opinion was entitled to little weight (Tr. 20-21). As the ALJ discussed, Dr. Othersen's conclusory statement that the plaintiff was incapable of gainful employment was an issue reserved to the Commissioner and was not entitled to any special significance (Tr. 20). *See* 20 C.F.R. § 404.1527(d); *see also* SSR 96-5p, 1996 WL 374183, at *5. Furthermore, the only limitation identified by Dr. Othersen was in dealing with the public, which the ALJ incorporated into the RFC (Tr. 21; *see* Tr. 2018). As the ALJ noted, "such a limitation would not preclude all work, as confirmed by the testimony of the vocational expert in response to [the ALJ's] hypothetical question" (Tr. 21). Moreover, the opinion was inconsistent with Dr. Othersen's treatment notes and other mental health evidence of record, which did not demonstrate work-preclusive mental limitations. For example, despite the plaintiff's poor medication compliance, the plaintiff had no psychotic symptoms, displayed coherent and linear thought processes, and interacted appropriately with his treating sources (Tr. 19; *see* Tr. 1918, 1982, 2014, 2075-76, 2086, 2169, 2210). The ALJ further noted the plaintiff' "pattern of missed appointments" in his mental health treatment (Tr. 19).

Furthermore, as argued by the Commissioner, while the ALJ reasonably concluded that the plaintiff did not have work-preclusive mental limitations, the ALJ afforded the plaintiff an RFC with generous mental restrictions, limiting the plaintiff to work that did not involve any interaction with the public, as noted above, and other mental limitations that were supported by the record, including work that involved only simple, routine tasks in a supervised environment and no team-type interaction with co-workers (Tr. 15).

Based upon the foregoing, the undersigned finds that the ALJ's assessment of Dr. Othersen's opinion was without legal error and based upon substantial evidence.

*Credibility*

Lastly, the plaintiff argues that the ALJ erred in not finding his testimony concerning the intensity, persistence, and limiting effects of his impairments credible (pl.

22

brief at 10-12).  The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . .  It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565.  However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which

> that impairment can reasonably be expected to cause the pain
> the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4.  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

> (1)     the individual's daily activities;

24

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3. *See* 20 C.F.R. § 404.1529(c).

The ALJ found that, while the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible (Tr. 16). Specifically, the ALJ found that there were "quite limited objective findings to support the degree of limitations" the plaintiff asserted (Tr. 19-20). Specifically, the plaintiff showed significant improvement following cervical fusion surgery, and, thereafter, the plaintiff's physical examinations did not demonstrate disabling functional limitations (Tr. 19). For example, following the plaintiff's surgery, Dr. Warmath found that the plaintiff had "excellent" results, and the plaintiff reported a significant reduction in his pain (Tr. 19; *see* Tr. 1540, 1577). The ALJ further noted that, although the plaintiff reported temporary exacerbation in his cervical and lumbar spine complaints after a car accident in 2012, his symptoms subsided, and his physical examinations remained generally unremarkable (Tr. 19; *see* Tr. 2195-96, 2100, 2200). The plaintiff's treating sources found that he had "good" ROM in his spine, upper extremities, and lower extremities; had full to near full motor

25

strength in his extremities; was able to ambulate with a slow, symmetrical gait without assistive device; and had negative straight leg raising tests (Tr. 2195-96, 2100, 2200). Further, the plaintiff told his treating physician he was "doing well with regard[] to his neck and back" pain (Tr. 2205). Moreover, the plaintiff reported improvement in his left shoulder impairment with treatment (Tr. 2195-96).

The plaintiff argues that the ALJ should have credited his subjective complaints concerning his limited ability to use his hands (pl. brief at 11). However, as noted above, the ALJ found that the plaintiff's complaints were undermined by the objective medical evidence and other evidence of record (Tr. 16-20). For example, the plaintiff had full to near full motor strength in his upper extremities and good grip strength (Tr. 17-19; *see* Tr. 1906, 1977, 2007, 2195-96). Also, the ALJ observed that the plaintiff had no difficulty using his hands during the administrative hearing (Tr. 20).

With regard to the plaintiff's alleged mental impairments, the ALJ found that the mental health examinations and treatment did not support work-preclusive limitations (Tr. 19). The plaintiff's mental health treatment was routine and conservative in nature, and treating sources documented the plaintiff's medication non-compliance and history of missed appointments (Tr. 19, 21; *see* Tr. 1918, 2086-87, 2091-92). Further, the plaintiff's mental status examinations showed that the plaintiff had no psychotic symptoms, displayed coherent and linear thought processes, and interacted appropriately with his treating sources (Tr. 19; *see* Tr. 1918, 1982, 2014, 2075-76, 2086, 2169, 2210).

The ALJ also considered the inconsistencies in the record and the plaintiff's activities, which undermined his claim of disabling physical or mental limitations (Tr. 15, 18, 20). For example, the plaintiff visited his family in Connecticut for extended periods, attended church, prepared simple meals, cleaned, washed laundry, drove a car, shopped in stores, went out to eat, talked on the phone, had friends and neighbors who visited him, read, and watched television (Tr. 20; *see* Tr. 278-85, 1537, 1965, 2168, 2201).

26

Based upon the foregoing, the ALJ's assessment of the plaintiff's credibility was without legal error and based upon substantial evidence. Accordingly, this allegation of error is without merit.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

July 21, 2015
Greenville, South Carolina

27